JORDAN v. GRANDFIELD BRIDGE CO.
et al. (No. 11645.)

(Court of Civil Appeals of Texas. Fort Worth.
Nov 27, 1926.)

1. Bridges ⚖=14—Charter of bridge company
held not void for authorizing bridge across
Red river, which was part of United States
public domain.

Charter of bridge company was not void
because it authorized maintenance of bridge
across Red river, which was part of United
States domain, where federal government,
which alone had right to urge such objection,
had not objected to such use of river bed.

2. Corporations ⚖=29(2)—Foreign corpora-
tion's charter cannot be attacked collaterally.

Charter of a foreign corporation cannot be
attacked collaterally.

3. Corporations ⚖=661(6)—Statute requiring
registration of foreign corporation does not
prevent defense by unregistered corporation
of action to recover title to property vested
in it (Rev. St. 1925, arts. 1529, 1536).

Rev. St. 1925, arts. 1529, 1536, requiring
foreign corporation to secure permit to do
business in state, does not deprive such corpo-
ration of right to defend action instituted to
recover title to property vested in it.

4. Corporations ⚖=656—Only state can ques-
tion foreign corporation's capacity to hold
title of real estate within state.

Capacity of foreign corporation to hold
title of real estate within state, either by rea-
son of failure to procure permit to do business
in state or for other reasons, can be questioned
only by state.

5. Corporations ⚖=656—Registered foreign
corporation may claim benefits of title ac-
quired after institution of action of trespass
to try title (Rev. St. 1925, art. 1532).

Foreign corporation, authorized to do busi-
ness within state, which was defendant in ac-
tion of trespass to try title, may claim bene-
fits of title acquired after institution of suit,
but before trial, in view of Rev. St. 1925, art.
1532.

6. Taxation ⚖=165—Statute requiring fran-
chise tax is inapplicable to unregistered for-
eign corporation (Rev. St. 1925, arts. 7085–
7087, 7091, 7092).

Rev. St. 1925, arts 7085–7087, 7091, 7092,
requiring payment of franchise tax by corpo-
ration have no application to foreign corpora-
tion until it has procured permit to transact
business within state.

7. Corporations ⚖=648—Secretary of state
must collect advance payment of franchise
tax before issuing to foreign corporation per-
mit to transact business within state (Rev.
St. 1925, arts. 7085–7087).

Rev. St. 1925, art. 7087, when read in light
of articles 7085, 7086, relative to payment of
franchise tax by corporations, makes it duty of
secretary of state to collect advance payment
of franchise tax before issuing to foreign cor-

poration permit to transact business within
state.

8. Evidence ⚖=83(1)—Secretary of state pre-
sumably collected advance payment of fran-
chise tax from foreign corporation before is-
suing permit to do business.

There is presumption that secretary of
state performed official duty and collected ad-
vance payment of franchise tax from foreign
corporation before issuing permit to transact
business within state.

9. Appeal and error ⚖=877(7)—Plaintiff, in
action of trespass to try title, cannot com-
plain that intervener was given right to main-
tain road on strip to which he failed to es-
tablish title.

Where plaintiff, in action of trespass to
try title, failed to establish title to certain
strip of land, he cannot complain that inter-
vener was given right to maintain public road
on such strip.

10. Trespass to try title ⚖=41(2)—In trespass
to try title, bridge company held entitled to
land on which end of bridge across Red river
was built.

In action of trespass to try title, bridge
company, which was foreign corporation, held
entitled to strip of land containing 2.68 acres
on which Texas end of bridge across Red
river to Oklahoma was built.

11. Appeal and error ⚖=877(3)—Plaintiff in
trespass to try title cannot complain that
third person may have some interest in land
awarded to defendant, where he recovered
his entire interest.

Where plaintiff, in trespass to try title, re-
covered his entire interest in land for which
he sued, he cannot complain that others may
have some interest in that portion that was
awarded to defendant, and that such others were
necessary parties to suit.

Appeal from District Court, Wichita Coun-
ty; Guy Rogers, Judge.

Trespass to try title by R. E. Jordan
against the Grandfield Bridge Company with
intervention by Wichita county. From the
judgment, plaintiff appeals. Affirmed.

R. H. Ward and R. L. Durham, both of
Houston, and Bullington, Boone, Humphrey &
King, of Wichita Falls, for appellant.

J. T. Montgomery, Wayne Somerville, C. B.
Felder, and Carrigan, Britain, Morgan &
King, all of Wichita Falls, for appellees.

DUNKLIN, J. The Tillman-Wichita Bridge
Company, a corporation chartered under
the laws of the state of Oklahoma, con-
structed a toll bridge across Red river, the
north end of which was in Tillman county,
Okl., and the south end in Wichita county,
Tex. The bridge was finished in February,
1920, but was open for travel by wagons and
teams in August, 1919. Ever since its comple-
tion it has been maintained and operated by
the Tillman-Wichita Bridge Company and the

---

⚖=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Grandfield Bridge Company; its successor and assignee, as a toll bridge for public travel. The Grandfield Bridge Company was likewise incorporated under the laws of the state of Oklahoma, by charter filed January 29, 1924. The south end of the bridge, for a length of 250 feet, lies south of the northern boundary line of Wichita county, which is also the northern boundary of the state of Texas at that point, as determined by the decision of the Supreme Court of the United States, in the case of Oklahoma v. State of Texas, 268 U. S. 252, 45 S. Ct. 497, 69 L. Ed. 942.

This suit was instituted by R. E. Jordan against the Grandfield Bridge Company in the form of trespass to try title to recover title and possession of 75 acres of land situated in Wichita county, on which the south end of the bridge is located, and which plaintiff alleged was either a part of the A. A. Durfee survey or a part of the F. Huseman survey.

Plaintiff also sought to recover damages in the sum of $100,000 as the value of the use of the strip of land covered by the south end of the bridge. The defendant disclaimed title to all that portion of the land sued for except 2.68 acres covered by the south end of the bridge, and claimed title to that strip.

Wichita county filed a plea of intervention, claiming a right of way for public road purposes over the 2.68 acres by donation from the owners of the fee-simple title thereto.

Judgment was rendered in plaintiff's favor, decreeing title in him to the entire tract sued for, with the exception of the 2.68 acres on which the south end of the bridge was constructed, and title to that strip was decreed to be vested in the defendant company subject to the right of intervener, Wichita county, to construct and maintain a public road way thereon. Plaintiff's prayer for recovery of damages against the defendant company was denied. Plaintiff has prosecuted this appeal.

The trial was before the court without a jury, and the trial judge filed findings of fact and conclusions of law, which are hereby adopted, and which are as follows:

"Plaintiff sues defendant in trespass to try title for certain lands on the waters of Red river, for damages, and for the appointment of a receiver. The defendant answers by disclaiming all but 2.68 acres of land sued for, pleads 'not guilty' thereto, and sets up its claim to the roadway. The county of Wichita intervenes, claiming to have a vested easement for road purposes in and to the 2.68 acres, and asking that such land be decreed now to be a public road.

"At the threshold of this case are met the vigorous contentions urged by plaintiff, in his exceptions to defendant's answer and the plea of intervention, that defendant, a private corporation organized under the laws of Oklahoma, is without capacity to sue or defend this action, because: (1) Its charter, granted to build across Red river a toll bridge, is void, because it passes over federal land, with only its abutments in Texas and Oklahoma. (2)

Not having a permit to do business in Texas, it could obtain no vested rights in the state by deed or otherwise. (3) That, subsequent to being sued herein, the permit then obtained comes too late to avail it of the right to acquire title or to defend their suit. These exceptions to the plea of intervention filed by the county, plaintiff insists that its plea contains no averments that entitle it to intervene and no prayer that this court has jurisdiction to grant; the district court not having jurisdiction to open a public road, it follows it has no jurisdiction to enlarge or widen or change the course of an existing road. Under this principle relief will be denied the intervener, wherein it seeks the establishment of a road of a width of 100 feet, and overruling plaintiff's exceptions to the plea asking the court to pronounce a roadway already established, to prevent a multiplicity of suits, and, in view of plaintiff's suggestion in his petition that the court's receiver, asked to be appointed, be permitted to fence the land for which he asks title, and over which intervener says it has a permanent easement for road purposes. The testimony will be considered thereunder.

"With exceptions thus disposed of and with issues thus joined, testimony was introduced from which the court finds and concludes as follows:

"Plaintiff holds under two claims of title, viz. A. A. Durfee and the Huseman. Defendant holds under the Huseman alone, as does the intervener. The Huseman patent, being senior to the Durfee, is paramount to the latter, if as a matter of law the original field notes of the Huseman of 1861 call for the river with its meanderings as its northern boundary.

"At the time of the original survey in 1861, some five surveys, viz. 812, 818, 819, 820, were made by the surveyor, Luckett, a plot thereof being made and filed for use in the General Land Office, the field notes of those surveys, respectively, save and except the Huseman call for the river as their north boundary line, and the Huseman, linked as it is by its field notes to adjacent surveys, and appearing as it does on the plot of the surveyor, Luckett, extends, in the opinion of the court, to Red river.

"The Durfee survey, to be existent, must be located between the north boundary of the Huseman and Red river, but, concluding that the Huseman itself goes to the river, the court further concludes that the Durfee is nonexistent, thus eliminates the title derived by plaintiff, deraigned from and under the Durfee.

"Suspended then is the clash between the parties under the Huseman title, plaintiff claiming under title deraigned from A. A. Morgan. A. A. and J. W. Morgan were brothers who in 18— bought jointly from Heman Specht, the common source, that portion of the Huseman survey lying north of a tract heretofore sold to C. Bisk. The Morgans lived on the land so bought and before divesting themselves with title in severalty thereto, built their respective houses thereon—J. W. on the west and A. A. on the east—running a fence from south to north between them, which extended to the high-water mark on Red river, although the lowland, of which the 2.68 acres herein involved is a part, was never fenced. Desiring title in severalty to the respective portions of the land thus jointly owned, respective deeds were executed, which deeds, re-

spectively, convey 298 acres and describe the land by metes and bounds, calls, and distances, without alluding to any intent to partition, and without calling either for the river or for the north line of the Huseman survey or the Specht tract. It is concluded that the deeds, unambiguous and certain, calling for 298 acres of land out of the Huseman survey, and describing the land so conveyed by metes and bounds, calls, and distances, cannot in themselves be considered to be a partition of the land then jointly owned, nor, under the law, can such deed be so interpreted by aid of the parol testimony of Jackson as to the parties' intentions.

"On the question of partition, there is suspended the remaining inquiry, whether there was in fact an actual partition on the ground before and irrespective of the deeds executed to each other.

"It is true that, while owning the land jointly, they built their respective houses and threw up between themselves fences which extended to the high-water marks of Red river, but the fact remains that they did not thus divide the lowlands, a part of which is involved in this controversy. Regardless of their purpose or intention, it cannot be said that they physically divided or took possession in severalty of the lowland lying north of the line called for as the north line in their respective deeds. Thus such land, approximately 75 acres, remained jointly owned until recent years.

"Plaintiff has title from J. W. Morgan to the fee of such 75 acres. Defendant and intervener have title to the fee of 2.68 acres from the life tenant and two of the four remaindermen under the will of A. A. Morgan. Plaintiff asks that this land, particularly that covered by the bridge and roadway, be declared his property. Defendant and intervener asked that this same land be equitably partitioned and they be given the title to the 2.68 acres, as well as an easement for road purposes thereon, respectively.

"Thus it appears that all parties hold under tenants in common, and that no partition as such has even been had or perfected, unless as a matter of law the parties by act or deed have effected such distribution. Had J. W. Morgan by deed have conveyed a specific acreage out of the total 75, not exceeding an amount equal to his portion thereof, and being of no greater value than the remaining acreage, his act being prior to any declaration by another joint owner, a partition would then have been perfected. But his interest in the land was only a half interest, and, so far as plaintiff claims under him, plaintiff became vested with only a half interest likewise. Supplementing the title thus obtained and jointly owned, plaintiff offers in evidence conveyances from Schnackenberg and Holtzen, who derived title from J. W. and A. A. Morgan, respectively, and whose deeds contain respectively the same field notes as are contained in the deeds from A. A. to J. W. Morgan and from J. W. to A. A. Morgan, respectively. Thus, as has heretofore been concluded, neither Schnackenberg or Holtzen's deed cover the land referred to herein as the 75-acre tract; hence no title thereto vested in them, and none passed by their conveyances to plaintiff in title.

"Even should it be concluded that Schnackenberg and Holtzen owned the land on which the bridge is built, still they had granted defendant a permanent easement for road and bridge purposes thereon long prior to plaintiff's acquiring deeds from them, pursuant to which easement thus granted, and relying, first, upon their written consent, and then upon their verbal authorization, consent, acquiescence, and ratification, defendant entered upon such land and built its bridge and roadway thereon at an expenditure of a great sum of money. When this portion of plaintiff's title was acquired, the bridge was built and the roadway opened, and plaintiff bought with notice thereof and subject thereto.

"At no time, then, has the plaintiff had the fee-simple title to the land at issue; the greatest interest ever held by him being an undivided one-half interest in the 75 acres. Nor has he, nor has his predecessor in title, either by deed or possession, sought to partition such land thus jointly owned. Plaintiff, irrespective of the right to recover, if at all, on the strength of his own title, assails defendant's title, in that a predecessor in title to defendant executed a deed to the Bass Petroleum Company, calling for the land of undetermined acreage north of the north line of the Taylor-Michna 50-acre tract embraced between the east and west lines of Holtzen's tract projected northward, and which tract called for the Texas-Oklahoma boundary as its north line.

"The court cannot indulge the presumption that such grantor meant to convey more than was by said deed conveyed, and the fact remains that no land was so conveyed. Hence, not having conveyed or appropriated the full portion of the land jointly held, such grantor and predecessor in title to defendant herein, was not estopped thereby from conveying by deed a portion of the land to defendant.

"But even in the deed to Bass Petroleum Co., the remaindermen did not join, nor have they ever conveyed except to defendant herein. While they cannot force a partition upon the life tenant, yet the life tenant alone can complain of any partition between them, and two of the remaindermen having conveyed 2.68 acres, and such land being less in value and amount to their interest, and the life tenant not complaining but joining with them, it is concluded that no partition was ever had that would preclude their conveying the 2.68 acres in question.

"The property being of a like kind, quality, and value, under the circumstances of the case, the court concludes that it is equitable to partition as prayed for by the defendant, and to grant to the intervener his prayer to declare now open and existing the roadway for which he prays."

The suit was instituted on September 17, 1925. At the time of its institution the defendant company had not procured from the secretary of state a permit to transact business in the state, as prescribed by article 1529, Rev. Statutes of 1925, nor had it paid a franchise tax to the state, as required by articles 7085 and 7086. However, a permit to do business in the state was duly issued to the defendant company on October 23, 1925.

[1, 2] By numerous assignments of error it is insisted that the charter of defendant company was void because it authorized the maintenance of the bridge across the channel of

Red river, which was part of the United States public domain, as determined by the federal Supreme Court decision noted above, and that any permit issued to the defendant company to do business in the state likewise would be void because the defendant company was not a valid corporation. We have been cited to no decisions, and have found none supporting that contention. Nor do we believe it is sound in principle. The federal government has not seen fit to object to such use of the river bed, and it alone has the right to urge such an objection. Moreover, it is well settled that a charter of a foreign corporation cannot be attacked collaterally. Galveston Land Co. v. Perkins (Tex. Civ. App.) 26 S. W. 256; Corpus Juris, vol. 14, §§ 4042, 4043, p. 1332.

[3, 4] A further contention is made that the defendant company has no right to defend the suit by reason of its failure to procure a permit to do business in the state prior to the institution of the suit. Article 1529 of the statutes, above referred to, which requires foreign corporations to procure a permit to transact business in the state, is found in chapter 19 of the Statutes of 1925, and article 1536, relating to the same subject-matter, reads as follows:

"No such corporation can maintain any suit or action, either legal or equitable, in any court of this state upon any demand, whether arising out of contract or tort, unless at the time such contract was made, or tort committed, the corporation had filed its articles of incorporation under the provisions of this chapter."

It will be noted that the article just copied does not deprive a foreign corporation of the right to defend an action instituted to recover title to property vested in it. Furthermore, it is the settled rule of decisions in this state that the capacity of a foreign corporation to hold title of real estate in this state, by reason of its failure to procure a permit to do business in the state, or for other reasons, can be questioned only by the state. Frost v. Thomas (Tex. Civ. App.) 238 S. W. 307; Wooten v. Dermott Town-Site Co. (Tex. Civ. App.) 178 S. W. 601.

[5] The deed relied upon by the defendant company to show title was executed by the heirs of A. A. Morgan on October 24, 1925, but the fact that that title was not acquired until after the institution of the suit did not preclude the defendant company from claiming the benefits of it. Article 1532 of the statutes expressly provides that, whenever a foreign corporation procures a permit to transact business in the state in accordance with the requirements of article 1529, it "shall have and enjoy all the rights and privileges conferred by the laws of this state on corporations organized under the laws of this state." And it is a familiar rule that a party to a suit may avail himself of title acquired, pending the suit and before final trial. Murphy v. Luttrell, 56 Tex. Civ. App. 149, 120 S. W. 905;

Schmidt v. Huff, 7 Tex. Civ. App. 593, 28 S. W. 1053; Compton v. Jennings (Tex. Civ. App.) 266 S. W. 571.

[6] Article 7085, c. 3, on the subject of franchise tax, requires the payment of a franchise tax by foreign corporations authorized to do business in this state. That article requires a payment of such franchise tax in advance, on or before the 1st day of May of each year. Article 7086 reads as follows:

"Whenever a private domestic corporation is chartered in this state, and whenever a foreign corporation is authorized to do business in this state, such corporation shall be required to pay in advance to the secretary of state, as its franchise tax from that time down to and including the thirtieth day of April next following, only such proportionate part of its annual franchise tax, as hereinabove prescribed, as the period of time between the date of filing of its articles of incorporation or the issuance of its permit to do business, as the case may be, and on the first day of May following, bears to a calendar year."

Article 7087 reads:

"To determine the amount of the first franchise tax payment required by this chapter of any domestic corporation which may be hereafter chartered, or of any foreign corporation which may hereafter apply for a permit to do business within this state, and also to determine the correctness of any report which is provided for in this chapter, the secretary of state may, whenever he deems it necessary or proper to protect the interests of the state, require any one or more of the officers of such corporations to make and file in the office of the secretary of state an affidavit setting forth fully the facts concerning the amount of the surplus and undivided profits, respectively, if any, of such domestic or foreign corporation; and until the secretary of state shall be fully satisfied as to the amount of such surplus and undivided profits, respectively, if any, he shall not file the articles of incorporation of such proposed domestic corporation, or issue such permit, or accept such franchise tax."

Article 7091 reads in part as follows:

"Any corporation, either domestic or foreign, which shall fail to pay any franchise tax provided for in this chapter when the same shall become due and payable under the provisions of this chapter, shall thereupon become liable to a penalty of twenty-five per cent. of the amount of such franchise tax due by such corporation. If the amount of such tax and penalty be not paid in full on or before the first day of July thereafter, such corporation shall for such default forfeit its right to do business in this state; which forfeiture shall be consummated without judicial ascertainment by the secretary of state entering upon the margin of the record kept in his office relating to such corporation, the words, 'right to do business forfeited,' and the date of such forfeiture. Any corporation whose right to do business shall be thus forfeited shall be denied the right to sue or defend in any court of this state, except in a suit to forfeit the charter of such corporation. In any suit against such corporation on a cause of action arising before such

forfeiture, no affirmative relief shall be granted to such corporation, unless its right to do business in this state shall be revived as provided in this chapter."

Article 7092 provides that a corporation may be relieved from forfeiture by paying to the secretary of state any time after the forfeiture the full amount of the franchise tax, and the penalties due with an additional amount of 5 per cent. of such tax for each month or any part of a month following the forfeiture.

[7, 8] We believe it manifest that those articles of the statutes requiring payment of a franchise tax have no application until a foreign corporation has procured a permit to transact business in this state. As noted above, the permit to transact business in the state was issued October 23, 1925, and there was no proof offered to show that defendant failed to pay franchise taxes after that date; the only proof being that no such tax had been paid up to and including October 16, 1925. Furthermore, we believe that article 7087, when read in the light of articles 7085 and 7086, makes it the duty of the secretary of state to collect the advance payment of franchise tax before issuing to a foreign corporation a permit to transact business in this state. And, in the absence of proof to the contrary, it must be presumed that the secretary of state performed that official duty and collected the franchise tax for that period at the time the permit was issued. Under article 7086 the advance payment then made covered the period extending to July 1, 1926, and during that period the case was finally tried.

[9] Since plaintiff failed to establish title to the strip of 2.68 acres awarded to the defendant, he is in no position to complain that the intervener, Wichita county, was given the right to maintain a public road on that strip. Furthermore, we believe that the intervener established such right by competent evidence.

The finding of the court that the Huseman survey took precedence over the Durfee survey, and that no title was acquired by plaintiff under muniments of title to the Durfee survey, was supported by ample evidence.

[10] We are of opinion further that there is sufficient support in the evidence for the further findings of the court to the effect that the 75 acres sued for by the plaintiff was never partitioned between A. A. and J. W. Morgan, and that plaintiff never acquired title to any part of A. A. Morgan's undivided one-half interest in the same. And the right in the defendant company to have that strip decreed to it under the facts recited in the court's findings is supported on principles of equity, under such decisions of Zabawa v. Allen (Tex. Civ. App.) 228 S. W. 664; Brown v. Brown (Tex. Civ. App.) 230 S. W. 1058; Gosch v. Vrona (Tex. Civ. App.) 227 S. W. 219; Lasa-

ter v. Ramirez (Tex. Com. App.) 212 S. W. 935.

[11] This was not a suit for partition of the 75 acres claimed by plaintiff. It was distinctly a suit by plaintiff in trespass to try title, and, since he recovered his entire interest in the 75 acres for which he sued, he is in no position to complain that other heirs of A. A. Morgan may have some interest in that portion that was awarded to the defendant, and that they were necessary parties to the suit. Even an outstanding title in them would be available as a defense to his suit.

All assignments of error are overruled, and the judgment of the trial court is affirmed.